BERTHA POOLE WEYL, PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket Nos. 27924, 29426.   Promulgated February 11, 1930.

*Henry E. Kelley, Esq.*, for the petitioner.
*J. E. Marshall, Esq.*, for the respondent.

OPINION.

ARUNDELL: The issue is whether contributions made to the League for Industrial Democracy in 1922 and 1923 were allowable as deductions under section 214 (a) (11) (B), Revenue Act of 1921. That it is an association and therefore to be treated as a corporation under section 2 (2), and that no part of its net income inures to the benefit of a private individual, we think is clear. It is claimed that the League was "organized and operated exclusively for educational purposes."

"Educational" and other derivatives of the word "educate" have been given exceedingly broad definitions by authorities and it may well be that some part of the work of the League could be brought within the definitions laid down, but, as we pointed out in *J. Noah H. Slee*, 15 B. T. A. 710, we take the view that Congress did not intend such broad definitions to be the test in these cases.

The object of the League, as stated in its constitution, was, "education for a new social order based on production for use and not for profit." Its use of the word "education" is, of course, not con-

clusive as to the character of the League. It appears from the evidence that the League sought to bring about what it calls "a new social order" through the use of both the spoken and written word, the former in giving lectures and debates, and the latter through the publication and distribution of printed literature. One of petitioner's witnesses stated, and it is contended by her counsel, that the League presented conflicting ideas on social and economical problems so that those interested in such matters could determine for themselves what stand to take. Granting that this was the League's practice in the lectures and debates presented under its auspices, and granting that there may have been some element of education in such functions, it does not necessarily follow that it operated exclusively as an educational institution and this is a requirement of the statute. *Herbert E. Fales*, 9 B. T. A. 828. An examination of the printed literature in evidence discloses quite plainly, we think, that the League, far from being devoted to "educating" in the sense of presenting both sides of the matter in which it was interested, advocated its side. The League's literature was directed very largely to political matters rather than educational objects. It may be, as argued by petitioner and quoting I. T. 1224, C. B. I-1, p. 256, that a league organized to "bring about a fair and open-minded consideration of * * * political * * * questions" comes within the statute, but in this case it is obvious from the League's literature that it was not engaged in such a pursuit; it was decidedly partisan, in advocating a "new social order."

The highly controversial nature of the League's aim—"a new social order based on production for use and not for profit"—is manifest from the mere statement of it and is sufficient to bring the case within the rule laid down in the *Fales* and *Slee* cases *supra*. In its campaign for this "new social order" the League advocated drastic political and economic changes which are directly at odds with existing economic theories and practices upon which society is founded in this country and which pervade our system of Government, and it is hardly to be presumed that Congress intended to foster such institutions by including them within the classification of institutions which are encouraged as a matter of public policy and as "aids of good government." *In re Moses Estate*, 123 N. Y. S. 443.

Reviewed by the Board.

*Decision will be entered for the respondent.*

---

STERNHAGEN, dissenting: The evidence, in my opinion, establishes that the League was "organized and operated exclusively for educational purposes." Education was its immediate purpose as expressed in its constitution, and education was actually the immediate

purpose of all its activities. True, the scope of the education was affected by a definite doctrine, but the end was not to be reached any faster than education would permit. Its methods were purely those of education—lectures, literature, and debates. Most of this was conducted through recognized colleges, universities, and organizations which participated, although outside of their curricula, in arranging the lectures and debates and permitted them frequently to be conducted in the college halls. The plan was genuinely to enlighten thought on all sides of a subject, to present conflicting ideas on public topics so that, as was testified, the students might take their own stand on them. While this was done with the belief that the League's social doctrine would ultimately prevail and that other doctrines and much of the existing social and economic order would be found fallacious and unwise, there was no mercenary influence and no concealments. Whether the ultimate doctrine was utopian or immediately practical, we need not consider, so long as the League's present purpose and operations were confined to education.

The literature which is distributed treats of various subjects by different authors with widely different styles and treatment. The one covering public ownership expressly admonishes the student to study the subject from all sides and consider both its successes and its failures. But there is a confusion in saying that the pamphlets deal with political matters rather than educational objects, for these two are not mutually exclusive. One is the subject of the education and the other is the process of teaching proper consideration of the subject. Of course there are political activities that have nothing to do with education, and contributions thereto are not deductible. This is not because they are political, but because they are not educational. This League is unlike the Birth Control League, considered in *J. Noah H. Slee*, 15 B. T. A. 710, for it has no legislative program brooding over its educational activities; and there is no such mixture of functions and activities as was found in respect of the organizations considered in *Herbert E. Fales*, 9 B. T. A. 828.

I agree fully that as used in the statute the word educational does not carry the broadest signification to be found in the dictionary. But I doubt whether its restriction in meaning is to be measured by the fact that there is controversy about the subjects taught. There are few branches of learning that escape controversy. Freedom of thought and difference of opinion are essential to education and progress. There is no justification for reading into the statute a qualification that we must be in agreement with the thesis or that the subject is one which, as we guess, Congress wanted to foster. What is the standard to guide a decision whether the purposes of an organization are at odds with the established order which Congress is to be presumed to foster? To me it seems that the tax deduction

was to foster any educational corporation described in the statute, whether its teaching, barring extremes, was in my opinion sound or unsound, liberal or conservative, so long as it was genuine and pure in its educational activity. Whether its education is controversial, political, or immediately or remotely effective, I think is beside the point.

The primary purpose of the League as expressed in its constitution is education, and it adheres strictly to this in its operations, as shown by the evidence. I think, therefore, it is within the statute and the contributions of this petitioner to it are deductible.

MARQUETTE agrees with this dissent.